UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JAQUANA BRAGGS ON BEHALF OF B.B. | * | CIVIL ACTION NO. 18-754 |
| | * | |
| VERSUS | * | SECTION: "B"(1) |
| | * | |
| NANCY A. BERRYHILL, ACTING | * | JUDGE IVAN L. R. LEMELLE |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| *************************************** | * | |

REPORT AND RECOMMENDATION

The plaintiff, Jaquana Braggs on behalf of the minor child B.B., seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying B.B.'s claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3). The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 15) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 20) be GRANTED.

## Procedural Background

On March 5, 2015, an application for SSI was filed on behalf of B.B. asserting a disability onset date of January 1, 2011. The following illnesses, injuries, or conditions were alleged: attention deficit hyperactivity disorder.  On September 9, 2015, B.B.'s claim was denied by the state agency. The Disability Determination Explanations concluded the "[m]edical evidence shows that [B.B.] has been diagnosed with ADHD. However, he is taking medication. He can perform activities normal for his age. His condition does not render him totally disabled at this time." R. at 98.

1

Plaintiff obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on November 16, 2016. On January 13, 2017, the ALJ issued an adverse decision. Plaintiff timely appealed to the Appeals Council, which denied review on November 20, 2017.

On January 24, 2018, filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 11, 12). The parties filed cross-motions for summary judgment. (Rec. Docs. 15, 20). Plaintiff is represented by counsel.

**Evidence in the Record**

Testimony

A hearing took place before the ALJ on November 16, 2016. R. at 32. B.B. was represented by counsel, and his mother was also present at the hearing. R. at 32.

B.B. testified that he likes school "sometimes" because he likes reading and math, but he gets frustrated when he gets something wrong on a test or in his work. R. at 40. B.B. testified that he has about ten friends at school and that he gets along well with them. R. at 41. He testified that he has gotten in trouble in class with his teachers and that the most recent time was the previous week for talking out of turn and being disrespectful. R. at 41. He said that happens every month or week. R. at 42.

B.B. testified that he has daily chores of cleaning the toilet, cleaning his room, and making his bed. R. at 43. But he said his older sister or his mother have to remind him to do his chores. R. at 44. He testified that he bathes himself and can remember to do that on his own, but that he needs to be reminded to brush his teeth and get dressed every day. R. at 45.

2

B.B.'s mother Jaquana Braggs also testified. She reported that she noticed a problem with B.B.'s functioning when he began pre-kindergarten and she received reports from school that he was impulsive and was not focusing. R. at 49. She testified that at the time of the hearing, B.B. was in fourth grade, but he was reading at a second-grade level. R. at 56. She said he had a reading comprehension problem. R. at 56. She explained that B.B. has been on a 504 Plan at school for three and a half years and that he gets accommodations like being pulled out in small groups, help with testing, and extra time on his classwork and on his tests. R. at 49. She testified that she did not think the interventions he was receiving were enough. R. at 59.

Ms. Braggs testified that B.B. sees his psychiatrist Dr. Cochran once a month and his therapist Mr. Keith twice a week. R. at 53. Ms. Braggs testified that she has to give B.B. Adderall for ADHD every day so that he will be able to focus at school. R. at 52, 54. Without that, she said, she will get a phone call reporting that B.B. is being disrespectful and when she speaks to him over the phone he will say he is not disrespecting his mother, but he will be talking back and not listening. R. at 52.

Ms. Braggs testified that B.B.'s ADHD symptoms have improved with his medication, but he still has issues with symptoms. R. at 55. She agreed with the assessment that B.B. had experienced 90% improvement with medication. R. at 60. But she noted that she has to remind him to complete his homework. R. at 56. She testified that B.B. does not play well with other children because he wants people to listen to him and he wants to direct them, but when they do not listen to him he gets aggressive. R. at 57. She said he can play sports, but when he does not win he wants to argue and fight. R. at 57. Ms. Braggs testified that B.B. does not get along well with his teachers, who say he is disrespectful and talks back. R. at 58. She testified that B.B. has

been developing mood swings, and that she has discussed this with his psychiatrist and they are monitoring him for now. R. at 60.

Ms. Braggs testified that B.B. has chores at home, but he cannot complete them independently. R. at 58. Ms. Braggs testified that B.B. cannot take feedback or accept losing a game. R. at 50. She said he shows aggressiveness and mood swings towards her. R. at 50. He blows his breath and stomps and walks away. R. at 50. Sometimes he gets in physical fights with his peers around his neighborhood, and as a result, Ms. Braggs said she had been keeping B.B. inside more. R. at 50-51.

As to other issues, Ms. Braggs testified that B.B. sleepwalks. R. at 51. Ms. Braggs also testified that B.B. had hearing problems as a young child and had several surgeries since the age of 3. R. at 52. She said the surgery went well, although he cannot have water in his ears. R. at 53.

<u>Medical Records</u>

B.B.'s first quarter report card dated September 26, 2013, from ReNEW Schaumburg Elementary includes the following behavior comments "[y]our child's behavior is directly affecting their education. It is a daily struggle to have your child stay focused and on task. Your child is often instigating situations such as talking, distracting other students, and leaving their desk without permission." R. at 293.

On December 3, 2013, B.B. underwent a psychiatric evaluation with Dr. Stephen R. Cochran at the Center for Hope. R. at 483. B.B.'s mother reported that B.B. had been diagnosed with ADD with ADHD at the Guidance Center. R. at 483. She said B.B. had been having problems with hyperactivity, attention, and focus since pre-kindergarten. R. at 483. She reported that B.B. was talking out in class, was being disruptive, and was disrespectful of authority. R. at 483. During

the examination, B.B.'s attitude was cooperative. R. at 484. Dr. Cochran noted an impression of ADHD with probable underlying mood disorder. R. at 485.

B.B.'s second grade report card for Q1 (generated on September 25, 2014) reports a grade of C in English Language Arts, an incomplete for math, and a C for nonfiction. R. at 347. B.B's Section 504 Individual Accommodation Plan ("IEP") dated September 22, 2014, assigns B.B. accommodations including increased time for classwork and tests, breaks, small group testing, and preferential seating. R. at 351.

B.B. was seen at the Rapid Treatment Program and Children's Hospital for ADHD. R. at 358. Dr. Maryling G. Walker, a licensed medical psychologist, issued a report on January 15, 2015, listing the results of an assessment that had been completed on July 2, 2014. R. at 358. Dr. Walker reported B.B.'s verbal intelligence was in the average range and his performance was in the borderline range. R. at 358. His word reading, sentence completion, and math computation were average. R. at 358. His spelling was low average. R. at 358. Formal educational assessment was recommended to rule out a disorder of written language. R. at 358. It was also recommended that B.B. be assessed for a 504 plan or other interventions.  R. at 358.

Meanwhile, on March 3, 2015, in conjunction with the application for disability benefits, Ms. Braggs completed a Function Report for B.B. on March 3, 2015. R. at 164.  She reported that B.B. has friends his own age and generally gets along with school teachers, but cannot make new friends, get along with other adults, or play team sports. R. at 170. She explained that when B.B. plays with other children he "gets controlling and when things don't go his way he starts hollering." R. at 170. She reported that he can use a zipper by himself, button clothes by himself, take a bath or shower without help, brush his teeth, comb or brush his hair, wash his hair by himself, choose clothes by himself, eat using a knife, fork, and spoon, hang up clothes, and get to school on time.

R. at 171. She reported that he could not obey safety rules like looking for cars before crossing the street, he does not help around the house, he does not do what he is told most of the time, and he does not accept criticism or correction. R. at 171. She reported that B.B. can keep busy on his own and work on arts and crafts projects, but he cannot finish things he starts, complete homework, or complete chores most of the time. R. at 172. She explained that he has a short attention span that is causing him to be behind in his school work. R. at 172. If he feels something is too hard, he does not want to stick with it and he gets bored and disturbs others. R. at 172.

A referral form dated March 26, 2015, from John Dibert Community School at Phyllis Wheatley notes that B.B.'s parent was seeking a new agency for medication management and counseling. R. at. 311. It is unclear who filled out the form, but it appears to be an individual with the Children's Bureau of New Orleans. R. at. 311. In the checkbox section of the form, numerous disruptive and high-risk behaviors are marked including frequent defiance; blaming, denying, and not accepting responsibility; sudden angry outbursts; mood swings; noisy, boisterous at inappropriate times; destruction of personal property (his things); harming animals; and angry mood and agitation. R. at 310.

In a letter to B.B.'s pediatrician dated April 15, 2015, Dr. Walker further reported on her evaluation and treatment of B.B. R. at 416. Dr. Walker reported that B.B. had started medication management with Adderall on September 29, 2014, with a dosage increase on November 18, 2014. R. at 416. Dr. Walker reported that B.B. had been monitored monthly, that B.B.'s mother had reported improvement, and that B.B. is no longer disruptive in class and is able to pay attention. R. at 416. B.B. had recently had behavior problems on the school bus on the ride home, but the teacher had not expressed concerns while in the classroom. R. at 416. Dr. Walker noted that B.B. was able to complete classwork but did poorly on tests. R. at 416. B.B.'s teachers had

recommended he repeat the second grade, but B.B.'s mother was opposed. R. at 416. Dr. Walker discussed the pros and cons of repeating a grade and recommended increased tutoring at home. R. at 416. Dr. Walker reported that B.B. was stable on medication and doing well behaviorally. R. at 416. Dr. Walker noted that B.B.'s mother had reported 90% improvement since he began treatment. R. at 416. Dr. Walker reported that she was closing the case at the Rapid Treatment Program because B.B. was stable and should follow up with his pediatrician for long term medication management. R. at 417.

On September 4, 2015, a consultative examination was performed by Dr. Scuddy F. Fontenelle, III, a licensed psychologist. R. at 436-38. B.B.'s motivation, effort, and cooperation were good. R. at 437. He showed no evidence of childhood autism, psychosis, or schizophrenia. R. at 437. Based on his vocabulary, his cognitive ability was estimated to be in the low average range. R. at 437. Dr. Fontenelle reported that B.B. is able to dress and wash himself. R. at 438. His speech communication was within normal limits. R. at 438. His social adaptive skills were considered to be low average for his age group. R. at 438. Dr. Fontanelle determined that B.B.'s social comprehension was age appropriate. R. at 438. Dr. Fontanelle reported that B.B.'s pace, persistence, and concentration seemed good with medication and his relationship with classmates and teachers was considered good. R. at 438. Dr. Fontenelle concluded B.B.'s prognosis was good with medication management. R. at 438.[1]

Cathy Word, Ph.D., reviewed B.B.'s records for the state agency, and on September 9, 2015, she concluded that B.B. does not functionally equal a listing. R. at. 97. Dr. Word determined

---

[1] A June 24, 2015, case analysis note in the state agency's disability review file by Dr. Cathy Word notes some inconsistencies between Dr. Walker's report discharging B.B. from the Rapid Treatment Program and school records showing behavioral problems and poor grades. R. at 433. Dr. Word recommended a consultative examination. R. at. 433. Following the consultative examination, on September 9, 2015, Dr. Word concluded "less than marked." R. at 439.

that B.B. has less than marked limitation in "interacting and relating with others" and "caring for yourself." R. at 96-97. Dr. Word also concluded that B.B.'s prognosis is good with medication management. R. at 98.

B.B. returned to the Center for Hope on December 1, 2015. R. at 482. At that visit, it was noted that B.B. had a positive response to increased Adderall. R. at 482. The plan was to continue medication. R. at 482.

B.B.'s IEP dated January 2016 assigns B.B. accommodations including extended time for classwork and tests, and allowance for breaks, small group/individualized testing, and preferential seating. R. at 304-08.

B.B. returned to the Center for Hope on January 7, 2016, and the progress note reports B.B. was "doing well" with "no problems," and the plan was to continue medication. R. at 481. The February 4, 2016, progress note included a diagnosis of ADHD and rule out bipolar. R. at 480. It was noted that B.B. was doing well except he still lies, is disrespectful, and is doing poorly academically. R. at 480. The plan was to continue medication. R. at 480. On March 3, 2016, it was noted that B.B. was doing ok but was still disrespectful and was having trouble with sleep. R. at 479. His Adderall dosage was increased. R. at 479. A March 21, 2016, progress note reports that B.B. was doing "good," but still had an "anger problem." R. at 478. Medication was continued. R. at 478. A May 4, 2016 progress note reports that B.B. gets "angry really bad." R. at 477. Weight loss of three pounds was noted. R. at 477. Adderall was continued. R. at 477. The May 26, 2016, progress note reports B.B. was doing well, but still had temper outbursts. R. at 476. Adderall was continued, and a prescription for Tenex was added. R. at 476. The June 23, 2016, progress note reports that B.B. was doing "good." R. at 475. His mother had spoken to his teachers, who did not feel B.B. needed the second medication and reported that he had fallen in with the wrong crowd

and they would offer more counseling. R. at 475. Adderall was continued and Tenex was discontinued. R. at 475. On July 25, 2016, it was reported that B.B. was sleep walking but otherwise doing well. R. at 474. Adderall was continued and a prescription for Clonidine was added. R. at 474. Progress notes dated August 18, 2016, and September 15, 2016, report B.B. was "doing well" and had "no problems." R. at 472-73. In each case, the plan was to continue with medication. R. at 472-73.

A Social Security Teacher Questionnaire was completed by Annie Davids, on September 14, 2016. R. at 366. Ms. Davids had been B.B.'s second grade ELA, Social Studies, and Science teacher for two months. R. at 359. In the domain of interacting and relating with others, she assessed B.B. as having a slight problem making and keeping friends, expressing anger appropriately, respecting/obeying adults in authority, relating experiences and telling stories, introducing and maintaining relevant and appropriate topics of conversation, taking turns in a conversation, interpreting the meaning of facial expression, body language, hints and sarcasm, and using adequate vocabulary and grammar to express thoughts/ideas in general, every day conversation. R. at 362. She assessed B.B. as having an obvious problem playing cooperatively with other children, seeking attention appropriately, asking permission appropriately, and following rules. R. at 362. She reported that she had observed no problems in caring for himself. R.at. 364.

On September 20, 2016, the claimant's counsel sent a letter to Dr. Cochran with Center for Hope noting that B.B.'s mother would be delivering a doctor questionnaire for him to complete. The letter noted that the questionnaire is "crucial" to B.B.'s social security claim. The letter also noted that B.B. needed an IEP recommendation so that an IEP evaluation would be initiated at his school and he could receive accommodations. The referenced form is labeled a "Childhood

Disability Determination Analysis of Functional Areas Form" and appears to be a form created by B.B.'s counsel, not an official Social Security form. The form lists and describes each of the six functional domains and provides a section for the respondent to check none, moderate, marked, or extreme. The last page of the form includes questions about the child's functioning with space for narrative comments.

One of the referenced forms was completed on September 22, 2016 by B.B.'s mental health specialist with the Center for Hope, who had been working with B.B. for one year and seven months. R. at 511. The name and the credentials of the person filling out the form is unclear, but it appears the form may have been completed by B.B.'s therapist Mr. Keith. In the checkbox section of the form, the specialist assessed B.B. as having a marked limitation in the domains of "acquiring and using information," "attending and completing tasks," and "interacting and relating with others," no limitation in "caring for himself," an extreme limitation in "moving about and manipulating objects," and a moderate limitation in "health and physical well-being." R. at 508-10. In the notes section, the specialist noted that B.B. enjoys playing sports, but has trouble with crossword puzzles and is unable to play Connect Four. R. at 511. Nonetheless, the specialist noted that B.B. is capable of doing activities that other children of the same age without impairments can do. R. at 511. The specialist noted that B.B. has difficulty completing homework assignments independently and needs one-on-one attention to help with focusing more. R. at 511.

Dr. Cochran completed also completed one of the referenced forms on October 18, 2016. R. at 517. In the checkbox section of the form, Dr. Cochran assessed B.B. as having moderate limitations in the domains of "acquiring and using information" and "attending and completing tasks." R. at 514. Dr. Cochran assessed B.B. as having a marked limitation in the domains of "interacting and relating with others," "caring for oneself," and "moving about and manipulating

objects." R. at 515-16. Dr. Cochran assessed B.B. as having no limitation in the domain of "health and physical well-being." R. at 516. Dr. Cochran noted that B.B. can dress, communicate needs, and read and write at an age appropriate level. R. at 517. But, Dr. Cochran reported that B.B. was not able to maintain healthy relationships with peers or follow rules at an age-appropriate level. R. at 517. Dr. Cochran noted that B.B. is more challenging when away from home and that he requires one-on-one assistance with school assignments, supervision when away from the home, and direct supervision and support when addressing his ADCs. R. at 517. Dr. Cochran noted that B.B. has issues with social skills, including expressing needs, resolving conflict, and completing class assignments. R. at 517.

A November 2016 record from B.B.'s school shows six "behavior" incidents between August 2016 and November 2016. R. at 297. B.B. had been sent out of the classroom three times for class disruption, once for extreme disrespect, and once for aggressive behavior. R. at 297, 300. The class disruption incidents involved talking to his neighbors, talking back and being off task, and throwing things. R. at 297. The extreme disrespect incident involved making fun of another student. R. at 297. The aggressive behavior incident involved throwing a pencil at another student with an aggressive look on his face and yelling "ugh." R. at 300. In the sixth incident, it was noted that B.B. reported being hit in the head by another student, and that he got angry and wanted to fight but chose to take a break instead. R. at 297. B.B.'s school records for this period also include three school bus behavior incident reports for incidents in September 2016 where he was crawling under the seat, fighting, and not sitting in his assigned seat.

## Decision of the Administrative Law Judge

Because B.B. was born on July 4, 2007, the ALJ found B.B. was a preschooler on March 5, 2015, the date of application, and was a school-aged child at the time of the ALJ's decision on

January 13, 2017. The ALJ determined that B.B. had not engaged in substantial gainful activity since the application date. The ALJ found that B.B. had the severe impairment of Attention Deficit Hyperactivity Disorder. But the ALJ found that B.B. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. The ALJ also found that B.B. does not have an impairment or combination of impairments that functionally equals the severity of the listings. In making this finding, the ALJ considered the six functional equivalence domains. The ALJ determined that B.B. has less than marked limitation in the domains of "acquiring and using information," "attending and completing tasks," "interacting and relating with others," and "caring for oneself." The ALJ determined that B.B. has no limitation in the domains of "moving about and manipulating objects" and "health and physical well being." The ALJ concluded that B.B. had not been disabled under the Act since March 5, 2015, through the date of decision on January 13, 2017.

### Statement of Issues on Appeal

Issue No. 1.    Whether the ALJ failed to give proper weight to the opinion of B.B.'s treating physician.

### Analysis

### I.    Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a

conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    **Entitlement to Benefits under the Act.**

A child under the age of 18 is "disabled" under the Act if he has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906; see 20 C.F.R. § 416.924. It is the claimant's burden to prove that he meets the definition of disabled. Fraga v. Bowen, 810 F.2d 1296, 1301–02 (5th Cir. 1987).

The ALJ employs the following three-step sequential process in evaluating childhood disability cases:  (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a severe impairment or combination of impairments; and (3) whether the severe impairment(s) meets, medically equals, or functionally equals the severity of any impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 416.924(a)-(d). In evaluating functional equivalence at step three, the ALJ considers how a child functions in his activities in terms of six domains of functioning. 20 C.F.R. § 416.926a(b)(1). The six domains are:

(1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. Id.  Functional equivalence means that the impairment is of listing-level severity and results in "marked" limitations in two of the six domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). A "marked" limitation in a domain is when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(2).   An "extreme" limitation interferes *very* seriously with the child's ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(3) (emphasis added).

At issue in the present appeal are the domains of "interacting and relating with others" and "caring for oneself." The domain of "interacting and relating with others" considers how well the claimant "initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [the claimant's] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others." 20 C.F.R. § 416.926a(i). The domain of "caring for oneself" concerns:

> how well [the claimant] maintain[s] a healthy emotional and physical state, including how well [the claimant] get[s] [his] physical and emotional wants and needs met in appropriate ways; how [the claimant] cope[s] with stress and changes in [his] environment; and whether [the claimant] take[s] care of [his] own health, possessions, and living area.

Id. § 416.926a(k).

The regulations require use of the "whole child" approach, which means that before analyzing each domain, the decision maker first considers how the child's functioning is affected during all of the child's activities. 20 C.F.R. § 416.926a(b); Id. § 416.926a(c); Title XVI:

Determining Childhood Disability Under the Functional Equivalence Rule-the "Whole Child"

Approach, SSR 09-1P (S.S.A. Feb. 17, 2009). As explained in the regulations,

> Any given activity may involve the integrated use of many abilities and skills; therefore, any single limitation may be the result of the interactive and cumulative effects of one or more impairments. And any given impairment may have effects in more than one domain; therefore, we will evaluate the limitations from your impairment(s) in any affected domain(s).

20 C.F.R. § 416.926a(c).

## I.    **Plaintiff's Appeal**.

Issue No. 1.    Whether the ALJ failed to give proper weight to the opinion of B.B.'s treating physician.

*a. Parties' Arguments*

B.B. argues that the ALJ failed to give proper weight to the treating physician's opinion. Indeed, the regulations provide that medical opinions from a treating source are generally given more weight, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(c). But a treating physician's opinions are not conclusive and "when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony." Myers v. Apfel, 238 F.3d 617, 621 (5th Cir. 2001) (quoting Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994)). Good cause exceptions "include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." Id.   (quoting Greenspan, 38 F.3d at 237). "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000). Those factors are as follows:

(1) the physician's length of treatment of the claimant,
(2) the physician's frequency of examination,
(3) the nature and extent of the treatment relationship,
(4) the support of the physician's opinion afforded by the medical evidence of record,
(5) the consistency of the opinion with the record as a whole; and
(6) the specialization of the treating physician.

Id.  at 456.

In filling out the form sent by B.B.'s counsel, Dr. Cochran checked the box for "marked limitation" in the functional domains of "interacting and relating with others" and "caring for oneself."[2] B.B. argues that these opinions of B.B.'s treating physician were entitled to controlling weight because they are not contradicted by other evidence in the record. Alternatively, B.B. argues that even if not given controlling weight, the opinions of Dr. Cochran should be given greater weight than the opinions of other non-treating physicians because of his unique longitudinal perspective. B.B. insists that Dr. Cochran's opinions are supported by the record evidence, including his medical records from Center for Hope documenting difficulty interacting with others, his academic records, and his mother's testimony at the hearing. The claimant argues that Dr. Walker's report does not contradict Dr. Cochran's conclusions because she was simply providing a diagnosis and a short-term course of treatment and further, even in concluding that B.B. was doing well behaviorally, Dr. Walker noted that B.B. did poorly on tests and his teachers recommended he repeat a year. Additionally, the claimant argues that the improvement noted by Dr. Walker was temporary because Dr. Cochran noted that B.B. is unable to maintain healthy relationships with peers and follow rules and that he requires direct supervision and support with his activities of daily living. The claimant explains that when B.B.'s mother testified that B.B. had

---

[2] Dr. Cochran also assessed B.B. as having a marked limitation in the domain of moving about and manipulating objects. Claimant does not appear to rely on that assessment here, and it is unclear what evidence in the record could support finding a marked limitation in this functional domain.

experienced 90% improvement since beginning treatment, she was testifying as to his improvement compared to his previous level of functioning and she did not testify that B.B. is functioning at "a ninety-percent level." B.B. points out that Ms. Braggs testified that B.B.'s functioning was still far below that of his sister. And Ms. Braggs also testified that B.B.'s disruptive behavior at school had gotten worse in the last year.

The Commissioner does not dispute that Dr. Cochran was B.B.'s treating physician. Instead, the Commissioner argues that the form filled out by Dr. Cochran does not qualify as a medical opinion at all. The regulations provide that "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). The regulations provide that an opinion that a person is disabled or opinions on issues "reserved to the Commissioner" "are not medical opinions" and are not given "any special significance." 20 C.F.R. § 416.927(d). Whether an impairment "meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404" is an issue reserved to the Commissioner. Id.  The Commissioner argues that Dr. Cochran's finding that B.B. has a marked limitation in the functional domains of "interacting and relating with others" and "caring for oneself" are opinions that B.B.'s impairment equals the requirements of a listed impairment, which is an issue reserved to the Commissioner and not given special significance. The Commissioner insists that the ALJ appropriately gave Dr. Cochran's opinion checkbox form partial weight, but not great weight, because the opinion is not consistent with the overall evidence of record, especially the evidence that B.B.'s impairment improved markedly with medication.

The Commissioner argues that substantial evidence supports the ALJ's finding that B.B. has less than marked impairment in the domains of "interacting and relating with others" and "caring for oneself." In the domain of interacting and relating with others, the Commissioner argues that the ALJ properly considered the report of Dr. Fontenelle who opined that B.B.'s social comprehension was age appropriate and that his prognosis was good with medication management. The Commissioner notes that the state agency reviewing psychologist, Dr. Wood, opined that B.B. has less than marked limitation in interacting and relating with others.

In the domain of caring for oneself, the Commissioner argues that the ALJ appropriately noted that B.B.'s teacher, Ms. Davids, reported no problems in this domain. The Commissioner also notes Dr. Wood opined that B.B. has less than marked limitation in the domain of caring for oneself, and that Dr. Fontanelle opined that B.B.'s social adaptive skills are in the low average range for his age group. The Commissioner adds that B.B. and his mother testified that B.B. had chores and responsibilities at home, though he requires monitoring and reminders to tend to his personal hygiene.

*b. Analysis*

First, the court considers whether the opinions of Dr. Cochran in the checkbox section of the form sent by B.B.'s counsel are medical opinions entitled to great weight. The Commissioner argues that the opinion that B.B. has a marked limitation in the functional domains of "interacting and relating with others" and "caring for oneself" are opinions as to whether B.B. "meets or equals the requirements" of a listed impairment, which is an issue reserved for the Commissioner and, therefore, not entitled to any special significance. However, the court finds that the opinions on the checkbox section of the form are one step back from such an opinion. Dr. Cochran did not opine that B.B. functionally meets or equals the requirements of a listed impairment. Instead, Dr.

Cochran assessed each functional domain and opined as to B.B.'s limitations. The Commissioner has presented no case law holding that opinions as to a child's impairments in each of the functional domains are issues reserved to the Commissioner. The court has sought and reviewed cases involving forms that mark an assessment of a child's impairment in the functional domains. The court has not found one where such a finding is rejected as an opinion reserved to the Commissioner. E.g., Murphy v. Colvin, No. 8:14-CV-0181-TBM, 2015 WL 12852969, at *5 (M.D. Fla. Mar. 25, 2015) (recognizing as a medical opinion the findings of a non-examining psychologist that the claimant had marked limitation in the domain for "attending and completing tasks" on a form, but finding no error in the ALJ's failure to mention the form in part because a finding of a marked limitation in one domain was not sufficient to result in a finding of functional equivalence); Tirado ex rel. E.T v. Astrue, No. 8:11-CV-1048-T-SPC, 2012 WL 1207095, at *10 (M.D. Fla. Apr. 11, 2012) (remanding to the ALJ to make specific findings regarding the weight given to the opinion of the claimant's treating physician on a form and to provide reasons for discounting the opinion where the treating physician opined that the claimant had a marked limitation in the domains of "interacting and relating with others" and "acquiring and using information" and an extreme limitation in the domain of "attending and completing tasks"). Accordingly, the court will not characterize Dr. Cochran's opinions on the form as opinions reserved to the Commissioner that are entitled to no special significance.

    The court next considers whether the ALJ properly discounted the opinions of Dr. Cochran that B.B. has marked limitations in the domains of "interacting and relating with others" and "caring for oneself." In reviewing the form that Dr. Cochran filled out, the ALJ assigned partial weight, finding that Dr. Cochran's opinions "do not reflect the overall objective findings of record, which indicate a 90% improvement in symptomatology with medication." R. at 19.  The ALJ is

free to give little weight to a treating physician's opinion when good cause is shown. Newton, 209

F.3d at 456. The court finds that good cause has been shown here.

The overall objective findings of record to which the ALJ refers are described by the ALJ

in the preceding paragraphs of the opinion. There the ALJ concluded that the evidence showed

B.B. had been treated with Adderall "causing a 90% improvement in symptomology," with citation

to the report of treating physician Dr. Walker. In that report, Dr. Walker notes B.B.'s mother

reported 90% improvement with medication,[3] and Dr. Walker concluded that B.B. was stable and

could follow up with his pediatrician for long term medication management. In the review of the

overall evidence of record, the ALJ concluded that B.B.'s condition had "generally been doing

well with no significant problems when on medication," with citation to the Center of Hope

records. Indeed, the Center of Hope is where B.B. treated with Dr. Cochran, and these records

reflect precisely what the ALJ describes. In February, March, and May 2016, the progress notes

indicate that B.B. was doing well, although he was still disrespectful and having trouble with anger.

In June 2016, B.B.'s mother reported that she had spoken with his teachers who said they did not

think he needed the Tenex prescription in addition to Adderall and that he had fallen in with the

wrong crowd and they would provide more counseling. By July 2016, it was reported that B.B.

was sleepwalking but otherwise doing well. The August and September 2016 progress notes report

that B.B. was "doing well" and had "no problems." This evidence contradicts the opinions of Dr.

Cochran that B.B. has a marked limitation in the domains of interacting and relating with others

and caring for himself.

Moreover, the opinions of Dr. Cochran on the form sent by B.B.'s counsel were created

for the purposes of B.B.'s social security application and not in the course of treatment. Dr.

---

[3] At the hearing before the ALJ, B.B.'s mother confirmed her agreement with the assessment that B.B. had experienced 90% improvement with medication.

Cochran's opinions regarding the severity of B.B.'s impairments in each of the functional domains were made in checklist fashion without citation to any supporting medical findings. Checklist forms like this one are generally viewed with disfavor when the opinions reflected therein are not adequately supported by any recitation of medical findings and where other evidence of record supports a contrary conclusion. Warncke v. Harris, 619 F.2d 412, 417 (5th Cir. 1980); Rodrigue v. Colvin, No. CIV.A. 13-1814, 2014 WL 2993423, at *15 (E.D. La. July 2, 2014); Haynes v. Astrue, No. CIV.A. 11-2289, 2012 WL 3860467, at *15 (E.D. La. July 23, 2012), report and recommendation adopted, No. CIV.A. 11-2289, 2012 WL 3863171 (E.D. La. Sept. 5, 2012), aff'd sub nom. Haynes v. Soc. Sec. Admin., 519 F. App'x 258 (5th Cir. 2013); see Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). "Detracting further from the evidentiary value of the opinions set forth in such checklist forms are those that are generated, not in the ordinary course of business, but in anticipation of and more proximate in time to Social Security administrative proceedings." Carter v. Berryhill, No. CV 16-11702, 2017 WL 3641614, at *11 (E.D. La. July 26, 2017), report and recommendation adopted, No. CV 16-11702, 2017 WL 3620800 (E.D. La. Aug. 23, 2017). Dr. Cochran did not fill out the form in the ordinary course of treatment. Indeed, when Dr. Cochran was provided the form, he was told it was crucial to B.B.'s social security application. Further, there are internal inconsistencies in the form filled out by Dr. Cochran here. For example, Dr. Cochran reported that B.B. had marked limitations in caring for himself, yet in the open-ended question section, he reported that B.B. can dress and communicate needs at an age appropriate level. Later in the open-ended question section, he noted that B.B. has issues expressing needs. Additionally, in the checkbox section of the form, Dr. Cochran marked B.B. as having marked limitations in the domain of moving about or manipulating

objects. Yet there does not appear to be any subjective or objective evidence in the record to support such a finding. It unsurprising that given the evidence to the contrary , the ALJ would assign only partial weight to Dr. Cochran's opinions on the form sent by B.B.'s counsel.

This is not a case where the ALJ has substituted her own opinion for that of the treating physician. Instead, the ALJ found that Dr. Cochran's opinion in the form sent by B.B.'s counsel should be given partial weight because it does not reflect the overall objective evidence showing 90% improvement in symptomology. The ALJ had good cause for doing so based on the report of treating physician Dr. Walker and Dr. Cochran's own treatment records. [4]

Further, the ALJ's findings that B.B. has less than marked limitations in the domains of "interacting and relating with others" and "caring for oneself" are supported by substantial evidence. As discussed above, the domain of "interacting and relating with others" concerns B.B.'s ability to initiate and sustain emotional connections with others, use the language of his community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others.  While treating records from the Center for Hope show some issues with disrespectful behavior, by July, August, and September 2016, no such problems were noted. Instead, it was recorded that B.B. was "doing well." Consultative examiner Dr. Fontenelle opined that B.B.'s social comprehension was age appropriate and that his prognosis was good with medication management. The state agency reviewing psychologist Dr. Word opined that B.B. had

---

[4] The claimant does not argue that the ALJ erred by failing to explicitly consider the factors in 20 C.F.R. § 404.1527(d). Indeed, the Fifth Circuit has not required consideration of the factors where, as here, evidence from other treating physicians controverts it. See Newton, 209 F.3d at 453 ("*[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).") (emphasis added); see also Jones v. Colvin, 638 F. App'x 300, 304 (5th Cir. 2016) (unpublished) ("ALJs are not required to consider the § 404.1527(c) factors before dismissing a treating physician's opinion if there is competing first-hand medical evidence contradicting that opinion."); Hamilton-Provost v. Colvin, 605 F. App'x 233, 240 (5th Cir. 2015) (unpublished) (stating in dicta that an ALJ is not required to consider the factors in § 404.1527 in rejecting a treating physician's opinion when that opinion is "controverted by evidence from other examining and treating physicians").

less than a marked limitation in the domain of interacting and relating with others. B.B. testified that he has friends at school and gets along well with them. Ms. Braggs testified that if she does not give B.B. his medication every day, she will get a phone call from school reporting that B.B. is being disrespectful. This testimony supports a finding that B.B.'s ability to interact and relate with others is improved with medication. The court notes that B.B.'s school records show five incidents of classroom disruption, disrespect, or aggressive behavior between August and November 2016 as well as three incidents in September 2016 when he was crawling under his seat, fighting, and not sitting in his assigned seat. The teacher questionnaire completed around the same time noted an obvious problem playing cooperatively with other children, but only a slight problem making and keeping friends, relating experiences and telling stories, expressing anger appropriately, and interpreting the meaning of facial expressions. Despite school records showing some problems in the domain of interacting and relating with others, the court finds substantial evidence supports the ALJ's finding that B.B. has less then marked limitation in this domain.

Similarly, substantial evidence supports the ALJ's finding that B.B. has less than marked limitation in the domain of caring for oneself. This domain concerns B.B.'s ability to maintain a healthy emotional state, how well he copes with stress and changes in his environment, how well he gets his physical and emotional wants and needs met in appropriate ways, and whether he takes care of his own health, possessions, and living area. To some extent, this domain overlaps with the domain of interacting and relating with others discussed above. As discussed there, Dr. Walker's records indicate 90% improvement in symptomology and that B.B. was stable on medication and doing well behaviorally. In addition, her report does not indicate any limitation B.B.'s ability to care for himself in an age appropriate fashion. The Center for Hope records, which indicate no problems (besides sleepwalking in July) in July, August, and September 2016, also do

not contain any report of issues in the domain of caring for oneself. And, as noted above, as to this domain, Dr. Cochran's opinions on the form are inconsistent, stating both that B.B. can communicate needs at an age appropriate level and that B.B. has issues expressing needs. Consultative examiner Dr. Fontanelle opined that B.B's social adaptive skills are in the low average range. And the state agency psychologist who reviewed the records concluded that B.B. has less than marked limitation in the domain of caring for oneself. Further, in the September 2016 teacher questionnaire, B.B.'s teacher reported no problems in the domain of caring for oneself. The court notes that B.B.'s mother reported in the function report that B.B. does not obey safety rules, accept criticism, or help around the house. But at the hearing B.B.'s mother testified that B.B. had chores around the house, although he needs reminders to get dressed and attend to his personal hygiene. The court finds the record is more than adequate to establish substantial evidence supporting the ALJ's conclusion that B.B. has less than marked limitation in the domain of caring for oneself.

For the foregoing reasons, the court finds that the ALJ did not err in discounting the opinions of Dr. Walker on the form sent by B.B.'s counsel. Further, the court finds that the ALJ's determination that B.B. has less than marked limitation in the domains of interacting and relating with others and caring for oneself is supported by substantial evidence.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 15) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 20) be GRANTED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 12th day of February, 2019.

Janis van Meerveld
United States Magistrate Judge